**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| **ELIZABETH KYLE-LABELL,** | : | |
| on behalf of herself and all others | : | |
| similarly situated, | : | **Civil Action No. 15-5193 (ES) (JAD)** |
| | : | |
| **Plaintiff,** | : | **OPINION** |
| | : | |
| v. | : | |
| | : | |
| **SELECTIVE SERVICE SYSTEM, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**SALAS, DISTRICT JUDGE**

Plaintiff Elizabeth Kyle-LaBell ("Plaintiff") is a 21-year-old female who wants to register for the military draft. She believes it is her right and duty as a United States citizen to do so, but because she is a woman, she is prohibited from registering. She brings this putative class action to challenge the constitutionality of the draft's male-only requirement. The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

Defendants Selective Service System ("SSS") and Donald M. Benton's[1] (together, "Defendants") moved to dismiss Plaintiff's Second Amended Complaint (D.E. No. 54 ("SAC")) under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (D.E. No. 80). The Court has considered the parties' submissions[2] and oral arguments. For the following reasons Defendants' motion is GRANTED-IN-PART and DENIED-IN-PART.

---

[1] Under Federal Rule of Civil Procedure 25(d), Donald M. Benton automatically replaced Lawrence G. Romo in this litigation.

[2] (D.E. No. 80-1 ("Defs.' Mov. Br."); D.E. No. 81 ("Pl.'s Opp. Br."); D.E. No. 82 ("Defs.' Reply")).

# I.      Background

## A.      Factual Background

The Military Selective Service Act, 50 U.S.C. § 3801, *et seq.* ("MSSA") provides in relevant part that

> it shall be the duty of every male citizen of the United States, and every other male person residing in the United States, who, on the day or days fixed for the first or any subsequent registration, is between the ages of eighteen and twenty-six, to present himself for and submit to registration at such time or times and place or places, and in such manner, as shall be determined by proclamation of the President and by rules and regulations prescribed hereunder.

50 U.S.C. § 3802.  "The MSSA established a plan for maintaining 'adequate armed strength . . . to insure the security of [the] Nation.'"  *Rostker v. Goldberg*, 453 U.S. 57, 75 (1981) (quoting 50 U.S.C. App. § 451(b)).  "Registration is the first step 'in a united and continuous process designed to raise an army speedily and efficiently. . . .'"  *Id.* (quoting *Falbo v. United States*, 320 U.S. 549, 553 (1944)).  "Congress provided for the reactivation of registration in order to 'provid[e] the means for the early delivery of inductees in an emergency.'"  *Id.* (quoting S. Rep. No. 96–826, at 156 (1980)).

In *Rostker*, the Supreme Court concluded that "Congress acted well within its constitutional authority when it authorized the registration of men, and not women, under the [MSSA]."  *Id.* at 83.  Particularly, the Court found that "[m]en and women, because of the combat restrictions on women, are simply not similarly situated for purposes of a draft or registration for a draft."  *Id.* at 78–79 ("The Constitution requires that Congress treat similarly situated persons similarly, not that it engage in gestures of superficial equality.").

Plaintiff asserts that women are no longer restricted from serving in combat roles, and as a result, the MSSA is now unconstitutional.  (*See generally* SAC).  Plaintiff has attempted to register

for the draft at least twice.  (*See id.* ¶ 5).  Each time, Plaintiff visited the SSS website and indicated on an online form that she was female.  (*See id.* ¶¶ 9–11).  When Plaintiff "clicked 'Female' on the top line of the online registration form, she was prevented from registering . . . ."  (*Id.* ¶ 10).  Plaintiff states that she will "continue to try to register" for the draft because she believes it is her "right and duty" as a U.S. citizen.  (*Id.* ¶ 12).

Plaintiff brings this action on behalf of a putative class consisting of over 15 million members.  (*Id.* ¶¶ 26–28).  Plaintiff alleges that the MSSA creates an unlawful sex-based categorization that violates her and the putative class members' equal-protection and substantive-due-process rights under the Fifth Amendment, because the MSSA (i) requires males and not females to register, and (ii) forbids females from registering.  (*See, e.g.*, *id.* ¶¶ 2, 29, 59 & 67).  She asserts that "[t]his archaic exclusionary policy sends a message to all U.S. citizens and institutions that women are not capable of shouldering the responsibilities of citizenship to the same extent as men."  (*Id.* ¶ 68).

Plaintiff seeks a declaratory judgment that the MSSA's draft registration is unconstitutional.  (*Id.* ¶ 13).  Plaintiff also seeks (i) to enjoin Defendants from registering only males; *or* (ii) to require that females register with the SSS; *or* (iii) to require that registration be voluntary for both sexes.  (*See id.* ¶ 14).

B.    **Procedural Background**

On July 3, 2015, Allison Marie Kyle initiated this action on behalf of her then minor daughter, Plaintiff.  (*See* D.E. No. 1).  On October 22, 2015, Plaintiff filed her first amended complaint.[3]  (D.E. No. 26).  Defendants then moved to dismiss for lack of standing and lack of ripeness under Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim under

---

[3]    This amendment added a second named plaintiff, but she later withdrew on February 6, 2016.  (*See* D.E. No. 44).

Federal Rule of Civil Procedure 12(b)(6).  (D.E. No. 33).

On June 29, 2016, the Court terminated Defendants' motion and ordered supplemental submissions regarding relevant Congressional activity.  (D.E. No. 48).  On September 29, 2016, Plaintiff filed a Second Amended Complaint which added Plaintiff as the named Plaintiff, while removing Plaintiff's mother.  (*See* SAC).  On December 21, 2016, the parties reported recent Congressional activities involving the MSSA, including the creation of the National Commission on Military, National, and Public Service (the "Commission").  (D.E. No. 57).

Plaintiff then filed a Motion to Continue the Proceedings, seeking to resume the litigation (D.E. No. 58).  On July 27, 2017, the Court granted the motion and permitted Defendants to renew their motion to dismiss on the issue of standing only.  (D.E. No. 61).  The parties then briefed the standing issue (D.E. Nos. 69–71), and on March 29, 2018, the Court denied Defendants' motion without prejudice, finding that Plaintiff had standing.  (*See* D.E. No. 73).

Plaintiff then sought leave to file a request for certification of the putative class and a motion for summary judgment.  (D.E. Nos. 74–76).  On April 18, 2018, the Court denied this request and permitted Defendants to renew their motion to dismiss under Rule 12(b)(1) for lack of ripeness and under Rule 12(b)(6) for failure to state a claim.  (D.E. No. 77).  Subsequently, the parties briefed the instant motion, (*see* D.E. Nos. 80–82), and the Court held oral argument on December 4, 2018, (D.E. No. 87).

## II.    Legal Standard

### A.      Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss for lack of ripeness is properly brought pursuant to Federal Rule of Civil Procedure 12(b)(1) because ripeness is a jurisdictional matter.  *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 341 (3d Cir. 2001) (citing *Suitum v. Tahoe Reg'l Planning*

*Agency*, 520 U.S. 725, 734 (1997)).  A party bringing a motion under Rule 12(b)(1) may assert either a "facial or factual challenge to the court's subject matter jurisdiction."  *See Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

In a facial attack, the moving party "challenges subject matter jurisdiction without disputing the facts alleged in the complaint."  *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016).  A facial attack "requires the court to consider the allegations of the complaint as true."  *See id.* (citation and internal quotation marks omitted).  "Thus, a facial attack calls for a district court to apply the same standard of review it would use in considering a motion to dismiss under Rule 12(b)(6), *i.e.*, construing the alleged facts in favor of the nonmoving party."  *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014); *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017).

In a factual attack, the moving party "attacks the factual allegations underlying the complaint's assertion of jurisdiction, either through the filing of an answer or 'otherwise presenting competing facts.'"  *Davis*, 824 F.3d at 346 (quoting *Constitution Party of Pa.*, 757 F.3d at 358) (alteration omitted).  "In contrast to a facial challenge, a factual challenge allows a court to weigh and consider evidence outside the pleadings."  *Id.* (citation and internal quotation marks omitted).

### B.     Federal Rule of Civil Procedure 12(b)(6)

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully." *Id.*

"In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). But a limited exception exists for "document[s] *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). "The purpose of this rule is to avoid the situation where a plaintiff with a legally deficient claim that is based on a particular document can avoid dismissal of that claim by failing to attach the relied upon document." *Jeffrey Rapaport M.D., P.A. v. Robins S. Weingast & Assocs., Inc.*, 859 F. Supp. 2d 706, 714 (D.N.J. 2012).

## III.    Discussion

Defendants raise three main arguments. Defendants first contend that Plaintiff's Complaint should be dismissed, or held in abeyance, on prudential ripeness grounds because Congress has created the Commission to conduct a full review of the SSS. (Defs.' Mov. Br. at 12). Defendants next argue that the Supreme Court's decision in *Rostker* controls the outcome of this case, and since only the Supreme Court can overturn itself, Plaintiff's claims must be dismissed. (*Id.* at 19). Finally, Defendants contend that Plaintiff's substantive due process claim is a request for equal treatment, which should be analyzed under the equal protection framework. (*Id.* at 24).

As discussed in detail below, the Court finds that A) Plaintiff's claims are prudentially ripe; B) the substantive due process claim is subsumed by the equal protection claim; and C) *Rostker* does not bar Plaintiff's equal protection claim.

### A.    Prudential Ripeness

Defendants contend that Plaintiff's Complaint should be dismissed, or held in abeyance,

- 6 -

on prudential ripeness grounds.  (*See id.* at 12; Defs.' Reply at 5; *see also* Tr. 2:5–10; 7:9–17, Dec. 4, 2018).

"[R]ipeness is peculiarly a question of timing."  *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985).  "The ripeness doctrine is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).  "At its core, ripeness works 'to determine whether a party has brought an action prematurely and counsels abstention until such a time as a dispute is sufficiently concrete to satisfy the constitutional and prudential requirements of the doctrine.'"  *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 539 (3d Cir. 2017) (quoting *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003)) (internal ellipsis removed).

Prudential ripeness is a tool a court may employ when the "case will be *better* decided later and that the parties will not have constitutional rights undermined by the delay."  *Simmonds v. I.N.S.*, 326 F.3d 351, 357 (2d Cir. 2003).  To determine whether a case is prudentially ripe, courts "generally examine: '(1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration.'"  *See, e.g.*, *Khodara Envtl., Inc. v. Blakey*, 376 F.3d 187, 196 (3d Cir. 2004) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977)); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014).[4]

---

[4]      In *Driehaus*, the Supreme Court questioned "the continuing vitality of the prudential ripeness doctrine."  573 U.S. at 167.  The Court noted that the doctrine "is in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging."  *Id.* (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)); *see also Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 539 n.3 (3d Cir. 2017) ("In [*Driehaus*], the Supreme Court also suggested that the prudential components of ripeness may no longer be a valid basis to find a case nonjusticiable.  To the extent we discuss prudential ripeness factors, our holding does not rest on them; rather, our holding rests on the constitutional requirements of Article III." (citation omitted)).

The Supreme Court, however, did not resolve that tension.  *See Driehaus*, 573 U.S. at 167.  Until the prudential ripeness doctrine is actually rejected by the Supreme Court, this Court is bound to apply *Abbott Labs* and

### 1.    Fitness of The Issues

For the fitness prong, "[t]he principal consideration is whether the record is factually adequate to enable the court to make the necessary legal determinations.  The more that the question presented is purely one of law, and the less that additional facts will aid the court in its inquiry, the more likely the issue is to be ripe, and vice-versa."  *Artway v. Attorney Gen. of State of N.J.*, 81 F.3d 1235, 1249 (3d Cir. 1996).

Here, the question before the Court—whether the MSSA's sex-based classification violates Plaintiff's constitutional rights—is purely a legal one, which is present, ongoing, and traditionally the type of issue handled by the courts.  *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 226 (1962) (noting that standards under equal protection "are well developed and familiar").  Plaintiff alleges that she has attempted to register at least twice, and each time Defendants applied the MSSA to bar her from doing so only because of her sex.  (*See* SAC ¶ 5).  She asserts that her rights, and the rights of similarly situated putative class members, are currently being violated as a result.  (*See id.* ¶¶ 67–69).  Thus, it is unlikely that "additional facts will aid the court in its inquiry."  *See Artway*, 81 F.3d at 1249.

Still, Defendants argue that the case is not fit for adjudication because "Congress passed legislation establishing a commission to conduct a bipartisan review of the future of military selective service."  (Defs.' Mov. Br. at 13).  Defendants place great weight on the Commission, which has been entrusted with conducting a broad bipartisan review of the SSS, and which "must complete its review and report its recommendations to Congress and the President by March 19, 2020."  (*Id.* at 13–14 (citing National Defense Authorization Act For Fiscal Year 2017 ("FY17

---

decades of precedent confirming the doctrine's vitality.  *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) (advising lower courts to "leav[e] to this Court the prerogative of overruling its own decisions").

NDAA"), Pub. L. No. 114-328 § 555(e)(1), 130 Stat. 2000, 2136 (2016)).[5]  Based on this ongoing review, Defendants contend that judicial intervention now would "wrest the issue from the political branches" and "could disrupt or distract" this process, which could "ultimately render that question moot."  (*Id.* at 14–15).  In short, Defendants contend that "proceeding with the litigation at this time would deprive the political branches of the opportunity to apply their judgment and experience to a matter that is committed to their authority by the text of the Constitution itself." (Defs.' Reply at 5 (citing Defs.' Mov. Br. at 12–18)).

This argument, however, ignores the reality that the Commission serves simply in an advisory capacity.  Its sole duty and authority is to review the SSS and draft a report for Congress. *See* FY17 NDAA §§ 551(a), 555(e)(1).[6]  While the Commission may be taking concrete steps towards providing a recommendation by March 2020, there is no guarantee that the Commission will complete its obligations by then, or that Congress will even act on the Commission's report. *Cf. Am. Petroleum Inst. v. E.P.A.*, 683 F.3d 382, 388 (D.C. Cir. 2012) (finding claim prudentially unripe and holding case in abeyance when there was a proposed rule before the government agency

---

[5]        The Commission is required to consider

> (1) the need for a military selective service process, including the continuing need for a mechanism to draft large numbers of replacement combat troops;
> (2) means by which to foster a greater attitude and ethos of service among United States youth, including an increased propensity for military service;
> (3) the feasibility and advisability of modifying the military selective service process in order to obtain for military, national, and public service individuals with skills (such as medical, dental, and nursing skills, language skills, cyber skills, and science, technology, engineering, and mathematics (STEM) skills) for which the Nation has a critical need, without regard to age or sex; and
> (4) the feasibility and advisability of including in the military selective service process, as so modified, an eligibility or entitlement for the receipt of one or more Federal benefits (such as educational benefits, subsidized or secured student loans, grants or hiring preferences) specified by the Commission for purposes of the review.

Pub. L. No. 114-328 § 555(b).

[6]        *See also Request for Information on Improving the Military Selective Service Process and Increasing Participation in Military, National, and Public Service*, 83 Fed. Reg. 7080-2, 7081 (Feb. 16, 2018).

which was required to take final action on the proposed rule by a specified date).  Meanwhile, Plaintiff and putative class members continue to have their constitutional rights allegedly violated.

That is not say that Congress or the Commission are not acting in good faith; the Court presumes that they are.  *See Marcavage v. Nat'l Park Serv*., 666 F.3d 856, 861 (3d Cir. 2012).  But the Constitution and the rights it protects cannot be held hostage to a possibility that a commission is investigating a particular policy, which may or may not give rise to legislation, which may or may not be enacted into law, which may or may not ultimately make the injury Plaintiff and others similarly situated are *currently* suffering, moot.  *See Am. Petroleum Inst.*, 683 F.3d at 388 (noting that government agency cannot "stave off judicial review of a challenged rule simply by initiating a new proposed rulemaking that would amend the rule in a significant way"); *Am. Petroleum Inst. v. U.S. E.P.A.*, 906 F.2d 729, 739–40 (D.C. Cir. 1990) ("If the possibility of unforeseen amendments were sufficient to render an otherwise fit challenge unripe, review could be deferred indefinitely.").

Similarly, Defendants' reliance on the doctrine of constitutional avoidance is unpersuasive. The principle of constitutional avoidance allows courts to avoid "ruling on federal constitutional matters in advance of the necessity of deciding them [and] to postpone judicial review where it would be premature."  *See Armstrong World Indus., Inc. by Wolfson v. Adams*, 961 F.2d 405, 413 (3d Cir. 1992).  As such, the Supreme Court has instructed that "even when jurisdiction exists it should not be exercised unless the case 'tenders the underlying constitutional issues in clean-cut and concrete form'" and that "[p]roblems of prematurity and abstractness may well present 'insuperable obstacles' to the exercise of the Court's jurisdiction, even though that jurisdiction is technically present."  *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 588 (1972) (citations omitted).  Accordingly, courts should be "particularly vigilant to ensure that cases are ripe when

- 10 -

constitutional questions are at issue." *Artway*, 81 F.3d at 1249.

However, vigilance does not mean abdication of the Court's responsibilities.  After all, the "[C]onstitution controls any legislative act repugnant to it," *Marbury v. Madison*, 5 U.S. 137, 177 (1803), and "[t]he operation of [a] statute is better grasped when viewed in light of a particular application," *Texas v. United States*, 523 U.S. 296, 301 (1998).  This is not a case involving an interim act, where the alleged injury rests on "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *See id.* at 300 (quoting *Thomas*, 473 U.S. at 580–581).  Nor is this a case where there is a definitive end point where the law at issue will be crystalized and final.  *See Am. Petroleum Inst.*, 683 F.3d at 388; *Am. Petroleum Inst. v. Envtl. Prot. Agency*, 862 F.3d 50, 56 (D.C. Cir. 2017), *decision modified on reh'g*, 883 F.3d 918 (D.C. Cir. 2018) (noting that the case was held in abeyance for several years as unripe in light of a forthcoming final rule).  To the contrary, as alleged by Plaintiff the MSSA is currently being fully enforced against her and other similarly situated women.  (*See* Compl. ¶¶ 5 & 9–10).  As such, the question before this Court could not be any more "clean-cut and concrete."  *See Gilligan*, 406 U.S. at 588; *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 838 (9th Cir. 2012) ("In contrast to cases in which the courts are left to hypothesize about how the law might be applied, Plaintiffs' claims arise from an enforcement action that has already occurred.").

Yet, Defendants effectively ask this Court to hold in abeyance Plaintiff's constitutional rights on the hope of "'contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *See Texas*, 523 U.S. at 300 (quoting *Thomas*, 473 U.S. at 580–581).  After all, Congress has visited and abandoned this very issue at least eight times since 2003.  *See, e.g.*, H.R. 1509, 114th Cong. (2015); H.R. 748, 113th Cong. (2013); H.R. 1152, 112th Cong. (2011); H.R. 5741, 111th Cong. (2010); H.R. 393, 110th Cong. (2007); H.R. 4752, 109th Cong. (2006); H.R.

2723, 109th Cong. (2005); H.R. 163, 108th Cong. (2003).  And in any event, the courts have not been deterred from adjudicating a concrete Article III controversy even when Congress is concurrently considering a bill which goes directly to the heart of the controversy at issue.  *See, e.g.*, *S. Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2099 & 2102–03 (2018) (reaching merits despite the fact that there were three bills pending before Congress addressing the issue, and despite the dissent's concerns that the Court's decision "may have waylaid Congress's consideration of the issue"); *Sure-Tan, Inc. v. N.L.R.B.*, 467 U.S. 883 (1984) (deciding a statutory interpretation issue despite Congress being in the midst of an intense congressional debate regarding directly relevant policy); *Goudy-Bachman v. U.S. Dep't of Health & Human Servs.*, 764 F. Supp. 2d 684, 691 n.3 (M.D. Pa. 2011) ("The court is cognizant of efforts currently underway to repeal the Act.  Obviously, it is not the court's role to speculate on pending legislation and we focus solely on the present enactment." (citations omitted)).

Defendants also argue that the Court should defer to "the bodies entrusted with crafting military policy on issues within their sphere of expertise," and that "Plaintiff cannot establish, nor should the Court attempt to predict, what the results" of the current policymaking process will be. (Defs.' Mov. Br. at 15–16).  But this mischaracterizes the legal question before the Court.  Plaintiff is not challenging the Commission, the Commission's ongoing review, or what Congress may or may not do with the Commission's recommendations.  (*See* Pl.'s Opp. Br. at 26).  Rather, Plaintiff is challenging the current enforcement of the MSSA.  (*Id.*).  That present enforcement gives rise to an injury today, and Defendants fail to show how review of that injury would "prove too abstract or unnecessary."  *See Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 735 (1998).  The question is fit for adjudication.

### 2.     The Hardship to the Parties of Withholding Court Consideration

The hardship factor turns on whether the impact of the particular law is "sufficiently direct and immediate." *Abbott Labs.*, 387 U.S. at 152. *Compare id.* (finding sufficient hardship where challenged policy had a "direct effect on the day-to-day business" of the plaintiffs), *with Texas*, 523 U.S. at 301 (finding no hardship where plaintiff was "not required to engage in, or to refrain from, any conduct"). For ripeness purposes, an evaluation of hardship to the parties "does not mean just anything that makes life harder; it means hardship of a legal kind. . . ." *Nat. Res. Def. Council v. Abraham*, 388 F.3d 701, 706 (9th Cir. 2004) (citing *Sierra Club*, 523 U.S. at 733).

Defendants recycle their standing argument, asserting that "Plaintiff faces no imminent hardship" because she is free to enlist, her career prospects in the military are not hindered, and there is no imminent draft. (Defs.' Mov. Br. at 17–18 & 24). But as Plaintiff points out, and the Court already noted, this argument mischaracterizes Plaintiff's injury:

> [Plaintiff's injury] is *not* that she is kept out of combat positions, *not* that she may be harmed by future inductions, *not* that she is prevented from enlisting, and *not* that possible career opportunities in the military will be hindered *but rather* that she is prevented—solely because of her sex—from *registering for the draft.*

(D.E. No. 72 at 8).

Plaintiff's harm is concrete, "'credible,' and not merely 'speculative.'" *See Artway*, 81 F.3d at 1247. As it currently stands, the MSSA requires Plaintiff to refrain from registering, unlike her male counterparts. Plaintiff alleges that this enforcement discriminates against her and similarly situated women based solely on their sex. (*See, e.g.*, SAC ¶ 10). Further, in the equal protection context,

> discrimination itself, by perpetuating "archaic and stereotypic notions" or by stigmatizing members of the disfavored group as "innately inferior" and therefore as less worthy participants in the political community, can cause serious noneconomic injuries to

- 13 -

> those persons who are personally denied equal treatment solely
> because of their membership in a disfavored group.

*Hassan v. City of New York*, 804 F.3d 277, 290 (3d Cir. 2015) (quoting *Heckler v. Mathews*, 465

U.S. 728, 739–40 (1984)).  Therefore, the enforcement of the MSSA creates a "sufficiently direct

and immediate" impact on Plaintiff and the millions of similarly situated young women; Plaintiff

is currenting suffering a substantial legal hardship.  *See Abbott Labs.*, 387 U.S. at 152.

Defendants argue that "proceeding with litigation at this point would deprive the political

branches of the opportunity to apply their judgment and expertise to a matter that is committed to

their authority by the text of the Constitution itself."  (Defs.' Mov. Br. at 18).  But Defendants fail

to show how exactly this will occur.  Regardless of this Court's ultimate decision, the Commission

and Congress are free to continue with the current policymaking process, and Congress is free to

pass legislation based on the Commission's recommendation—or not.  The courts cannot stop

Congress from legislating any more than Congress can stop the courts from interpreting the

Constitution and any legislative acts repugnant to it.  *See United States v. Nixon*, 418 U.S. 683,

704–05 (1974); *Marbury*, 5 U.S. at 177.  After all, the judiciary is an independent branch of our

tripartite system of government, entrusted with the "province and duty . . . to say what the law is"

when presented with a concrete controversy, without regard to the vagaries of shifting political

winds.  *See Bank Markazi v. Peterson*, 136 S. Ct. 1310, 1322 (2016) (quoting *Marbury*, 5 U.S. at

177); *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) ("We will not

shrink from our duty 'as the bulwar[k] of a limited constitution against legislative encroachments.

. . .'") (quoting The Federalist No. 78, p. 526 (J. Cooke ed. 1961) (A. Hamilton)).  "That duty will

sometimes involve the '[r]esolution of litigation challenging the constitutional authority of one of

the three branches,' but courts cannot avoid their responsibility merely 'because the issues have

political implications.'"  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012) (quoting

*INS v. Chadha*, 462 U.S. 919, 943 (1983)).  And that duty requires this Court to determine whether the Constitution is being obeyed *today*, not to speculate whether it might be obeyed in the future. Therefore, the Court does not perceive any potential separation of powers issues with proceeding on the merits, and to the extent any may exist, it does not outweigh the hardship befalling Plaintiff.

Finally, Defendants argue that the Court should find the case prudentially unripe because of the deference owed to the "considered professional judgment" of military officials in military matters.  (Defs.' Mov. Br. at 16–17).  But while judicial intervention in military matters "should only be undertaken with care and circumspection," *Jaffee v. U.S.*, 663 F.2d 1226, 1238 (3d Cir. 1981), that is ultimately an issue to be studied on the merits with the benefit of a more developed record.  *See Dillard v. Brown*, 652 F.2d 316, 323–24 (3d Cir. 1981) ("If the military justification outweighs the infringement of the plaintiff's individual freedom, we may hold for the military on the merits, but we will not find the claim to be non-justiciable and therefore not cognizable by a court.").[7]  Indeed, a review of decisions in this area shows "not the slightest hesitancy about reaching the merits even though military affairs were involved."  *See Serv. Women's Action Network v. Mattis*, 320 F. Supp. 3d 1082, 1090 (N.D. Cal. 2018) (quoting *Owens v. Brown*, 455 F. Supp. 291, 301 (D.D.C. 1978)) (citing examples).

In short, the Court will uphold its "virtually unflagging" Article III obligation to hear and decide the present case, which falls squarely within its jurisdiction.  *See Driehaus*, 573 U.S. at 167; *see also Nat'l Coal. for Men v. Selective Serv. Sys.*, 640 F. App'x 664, 665 (9th Cir. 2016).

---

[7]      Defendants argue that they have never claimed that Plaintiff's claims are non-justiciable.  (Defs.' Reply at 1).  But standing and ripeness, two doctrines Defendants have argued bar Plaintiff's Complaint, are parts of the justiciability doctrine.  *See Solomon v. United States*, 680 F. App'x 123, 126 (3d Cir. 2017) (quoting *Felmeister v. Office of Attorney Ethics*, 856 F.2d 529, 535 (3d Cir. 1988) ("The ripeness doctrine, like other justiciability doctrines, derives ultimately from the requirement in Article III of the United States Constitution that federal courts are only empowered to decide cases and controversies.")); *see also* 13B Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3529 (3d ed.) (grouping standing, ripeness, mootness, and political question under the "Justiciability" chapter).

### B.      Substantive Due Process Claim

As previously stated, Plaintiff alleges that by forbidding women from registering with the SSS, the MSSA violates her and putative class members' "equal protection rights to equal treatment and opportunity and violat[es] their substantive due process rights to be treated as first-class, full-fledged citizens. . . ." (SAC ¶ 67).  Defendants argue that the substantive due process claim is one of unequal treatment, which is more appropriately analyzed as a claim for equal protection.  (Defs.' Mov. Br. at 25).  The Court agrees.  At their core, these two claims are one and the same and should be analyzed under the equal protection rubric.

The substantive component of due process "provides heightened protection against government interference with certain fundamental rights and liberty interests."  *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).  Only fundamental rights and liberties which are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty" qualify for such protection.  *Id.* at 721 (citations omitted).  Further, the Supreme Court requires "a 'careful description' of the asserted fundamental liberty interest."  *Id.*

The Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."  *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992); *see also Chavez v. Martinez*, 538 U.S. 760, 775 (2003) (collecting cases).  This is because "[b]y extending constitutional protection to an asserted right or liberty interest," the courts "place the matter outside the arena of public debate and legislative action."  *Glucksberg*, 521 U.S. at 720 ("We must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court."  (citations and internal quotation marks omitted)).

- 16 -

Here, Plaintiff asserts a fundamental right to be "treated as a first-class, full-fledged citizen." (SAC ¶ 3). Her claim revolves around allegations that under the MSSA women are, as a class, treated differently than men. (*See, e.g.*, SAC ¶ 4 ("Barring young women from registering with the Selective Service System is one of the last vestiges of federal *de jure* discrimination against women."); *id.* ¶ 5 (alleging that Plaintiff tried to register with the SSS but "was refused solely because she is a woman. This violated her right to be treated equally regardless of sex and her substantive due process right to be treated as a first-class, full-fledged citizen"); *id.* ¶ 15 ("This Court will place all similarly situated persons on an equal standing and recognize the first-class, full-fledged citizenship of young women by enjoining all current draft registration or by requiring females to also register or by making registration voluntary for both sexes."); *id.* ¶ 65 ("If the two sexes can fight and die together, they can register together; if not, then no one should have to register."); *id.* ¶ 67 ("The female class members are injured by the government violating their equal protection rights to equal treatment and opportunity and violating their substantive due process rights to be treated as first-class, full-fledged citizens by <u>not</u> requiring them to register and forbidding them to register."); *see also* Tr. 51:15–17 (stating that by denying Plaintiff's request to register "she's being treated as, basically, a second-class citizen")). At its core, then, Plaintiff demands that the law treats all women citizens equal to all male citizens. This claim falls squarely within the precepts of equal protection. *See United States v. Virginia*, 518 U.S. 515, 532 (1996).

Plaintiff attempts to avoid this conclusion, arguing that "the use of one analysis does not obviate the use of the other." (Pl.'s Opp. Br. at 38 (citing *Lawrence v. Texas*, 539 U.S. 558, 579 (2003)). This may be true in certain circumstances; after all, the equal protection component read into the Fifth Amendment arises from discrimination that is "so unjustifiable as to be violative of due process." *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954), *supplemented sub nom. Brown v.*

*Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955).[8]  But this "do[es] not imply that the two are always interchangeable phrases." *Id.*  As Justice Kennedy explained in *Obergefell v. Hodges*,

> The Due Process Clause and the Equal Protection Clause are connected in a profound way, though they set forth independent principles.  Rights implicit in liberty and rights secured by equal protection may rest on different precepts and are not always co-extensive, yet in some instances each may be instructive as to the meaning and reach of the other.  In any particular case *one Clause may be thought to capture the essence of the right in a more accurate and comprehensive way*, even as the two Clauses may converge in the identification and definition of the right.

135 S. Ct. 2584, 2602–03 (2015) (emphasis added).

Furthermore, it "is not the province of [the courts] to create substantive constitutional rights in the name of guaranteeing equal protection of the laws."  *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33 (1973).  Rather, "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."  *Albright v. Oliver*, 510 U.S. 266, 272 (1994).  In other words, substantive due process is reserved "for cases involving the most intimate matters of family, privacy, and personal autonomy."  *Armbruster v. Cavanaugh*, 410 F. App'x 564, 567 (3d Cir. 2011); *see also Lawrence*, 539 U.S. at 562 ("Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct.").

---

[8]     Defendants rely on *Graham v. Connor*, 490 U.S. 386 (1989), and its progeny for the proposition that "when a particular Amendment provides an explicit textual source of constitutional protection against' a particular sort of governmental behavior, that Amendment, not the more generalized notion of substantive due process must be the guide for analyzing these claims." (Defs.' Mov. Br. at 24–25 (quoting *Graham*, 490 U.S. at 395)).  Plaintiff counters that *Graham* is confined to cases where the government has used physical force.  (Pl.'s Opp. Br. at 37).  The Court does not read *Graham* so narrowly, and indeed, other courts applying the Equal Protection Clause of the Fourteenth Amendment have not either.  *See, e.g.*, *Eby-Brown Co., LLC v. Wis. Dep't of Agric.*, 295 F.3d 749, 753–54 (7th Cir. 2002) (refusing to analyze substantive due process claim where "[t]he bulk of the allegations set forth by Eby–Brown seek redress for the alleged unequal treatment it received as a licensed wholesaler of tobacco").

    The Fifth Amendment, however, does not contain an "explicit textual source" for equal protection of the laws.  *See* U.S. CONST. amend. V.  Rather, the Supreme Court has read an equal protection component into the Amendment's express Due Process Clause.  *See Bolling*, 347 U.S. at 499.  As such, it would appear that *Graham* and its progeny do not support Defendants' argument, and the Court sees no reason to rely on that line of cases here.

This case does not concern "matters relating to marriage, family, procreation, and the right to bodily integrity."  *See Albright*, 510 U.S. at 272.  Rather, the core of the fundamental right asserted by Plaintiff—that all citizens, men and women, be treated as equal "first-class, full-fledged citizen"—is one of equal treatment under the laws.  While equal protection is in one sense a personal right not to be discriminated against—indeed, a right "stemming from our American ideal of fairness" *Bolling*, 347 U.S. at 499, which is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty," *see Glucksberg*, 521 U.S. at 721—it is predominantly "a demand that governmental action that affects an individual not be predicated upon constitutionally defective reasoning."  *See Pitts v. Thornburgh*, 866 F.2d 1450, 1455 (D.C. Cir. 1989); *Harris v. McRae*, 448 U.S. 297, 322 (1980) ("The guarantee of equal protection under the Fifth Amendment is not a source of substantive rights or liberties, but rather a right to be free from invidious discrimination in statutory classifications and other governmental activity." (footnote omitted)).  The claim here charges invidiousness on account of the statutory classification, rather than an unwarranted interference with constitutionally secured personal liberties.  (*See, e.g.*, SAC ¶ 5).[9]  As such, the equal protection analysis "capture[s] the essence of the [asserted] right in a more accurate and comprehensive way."  *See Obergefell*, 135 S. Ct. at 2603.

During oral argument Plaintiff pointed the Court to *United States v. Virginia*, 518 U.S. 515 (1996), for support of her alleged fundamental right.  (*See* Tr. 47:2-4).  Plaintiff placed substantial emphasis on the Supreme Court's language that the government cannot deny "to women, simply because they are women, full citizenship stature."  (*See* Tr. 47:2-3 (quoting *Virginia*, 518 U.S. at 532)).  Plaintiff argued that the alleged fundamental right to be a "first-class, full-fledged citizen"

---

[9]       Indeed, at oral argument Plaintiff admitted that the underlying factual allegations for the substantive due process claim are the same as the equal protection claim.  (*See* Tr. 51:19; *see also generally* SAC).

is just another name for "full citizenship stature." (Tr. 47:5-8). A careful reading of the full quote, however, undercuts Plaintiff's argument that her substantive due process claim should not be subsumed by her equal protection claim:

> Since *Reed*, the Court has repeatedly recognized that neither federal nor state government acts compatibly *with the equal protection principle* when a law or official policy denies to women, simply because they are women, full citizenship stature—*equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities*.

*Virginia*, 518 U.S. at 532 (relying on the equal protection framework to find that Virginia military college sex-based classification was unconstitutional) (emphasis added). Indeed, the Supreme Court's decisions involving sex-based classifications and unequal treatment between men and women have often involved both equal protection and substantive due process concerns, but overwhelmingly, the decisions in this area rest on an equal protection framework. *See, e.g.*, *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017); *Virginia*, 518 U.S. at 532; *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 731 (1982); *Rostker*, 453 U.S. at 78–79; *Michael M. v. Superior Court*, 450 U.S. 464, 471–73 (1981); *Orr v. Orr*, 440 U.S. 268, 278–83 (1979); *Craig v. Boren*, 429 U.S. 190, 210 (1976); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 652 (1975); *Schlesinger v. Ballard*, 419 U.S. 498, 508–09 (1975); *Frontiero v. Richardson*, 411 U.S. 677, 690–91 (1973); *Reed v. Reed,* 404 U.S. 71, 76–77 (1971); *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 120 (1996) (noting that the "Court's decisions concerning access to judicial processes . . . reflect both equal protection and due process concerns" but ultimately applying equal protection because "[m]ost decisions in this area, the Court has recognized, res[t] on an equal protection framework." (citations and internal quotation marks omitted) (alterations in original)).

In this respect, then, Plaintiff's reliance on cases such as *Lawrence* is of little help to her substantive due process claim. (*See* Pl.'s Opp. Br. at 37–38). *Lawrence* dealt with the right of

consenting adults to engage in intimate sexual conduct, which is fundamentally a matter of personal liberty and autonomy.   *See Lawrence*, 539 U.S. at 578.   Such non-enumerated fundamental rights fall within the purview of substantive due process, even while at the same time "the Equal Protection Clause can help to identify and correct inequalities . . . vindicating precepts of liberty and equality under the Constitution."   *See Obergefell*, 135 S. Ct. at 2604.

It is not so clear, however, that applying substantive due process here and recognizing a broad fundamental right to be "treated as a first-class, full-fledged citizen," in addition to the already existing equal protection guarantee, will do the same.   After all, joining the military is not a personal right, and by inference, neither is registration for the draft.   *See Lindenau v. Alexander*, 663 F.2d 68, 72 (10th Cir. 1981); *Crawford v. Cushman*, 531 F.2d 1114, 1125 (2d Cir. 1976).   But more importantly, recognizing Plaintiff's asserted fundamental right—which would essentially require the application of strict scrutiny any time the government imposes a sex-based classification—could endanger the long line of precedent applying an intermediate scrutiny framework to such classifications.   This Court is in no position to do that and will follow the Supreme Court's reluctance "to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended."   *Collins*, 503 U.S. at 125.   Accordingly, the Court dismisses the substantive due process claim.

### C.      Equal Protection Claim

Defendants argue that Plaintiff fails to state a claim because the Supreme Court decision in *Rostker* directly controls this case.   (*See* Defs.' Mov. Br. at 19–21).   They contend that "Plaintiff asserts a virtually-identical equal protection claim to the one that the Supreme Court rejected in *Rostker*."   (*Id.* at 19).   As such, Defendants contend that this Court is bound to follow *Rostker*, because only the Supreme Court can overrule itself.   (*Id.* (citing *Rodriguez*, 490 U.S. at 484;

*Agostini v. Felton*, 521 U.S. 203, 237 (1997)).[10]

In opposition, Plaintiff asserts that the facts have substantially changed since *Rostker* was decided, and as such, *Rostker* does not directly control the outcome of this case.  (Pl.'s Opp. Br. at 30).  She argues that she does not seek to overrule *Rostker*, but "is simply asking this Court to enforce her rights under the Due Process Clause by applying the rule in *Rostker* to the present facts."  (Pl.'s Opp. Br. at 29–30).

Before analyzing these arguments, the Court finds it helpful to first examine the *Rostker* decision and intervening changes.

### 1.    *Rostker v. Goldberg*

In *Rostker* a group of men challenged the constitutionality of the MSSA.  *See Goldberg v. Rostker*, 509 F. Supp. 586, 588 (E.D. Pa. 1980).  After discussing the lower court's decision, the Supreme Court began its analysis by recognizing Congress's sweeping and "broad constitutional power" over military affairs.  *Rostker*, 453 U.S. at 65.  The *Rostker* Court thoroughly explained the reasons for providing deference to the political branches when adjudicating issues within the area of military affairs.  *See id.* at 64–67.  The Court noted that the judiciary "must be particularly careful not to substitute our judgment of what is desirable for that of [the executive and legislative branches], or our own evaluation of evidence for [their] reasonable evaluation" because "[i]t is difficult to conceive of an area of governmental activity in which the courts have less competence."  *Id.* at 65 (quoting *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973)).  Thus, courts should give "healthy

---

[10]        Defendants also argue that Plaintiff fails to state a claim because entry of the relief sought would impermissibly intrude on the Commission's, Congress's, and the Military's authority over military affairs.  (*See* Defs.' Mov. Br. at 21–24).  But Defendants do not explain just how this alleged intrusion, which would arise only if the Court grants Plaintiff's requested relief, somehow means Plaintiff has failed to state a claim.  (*See generally id.*).  Further, although Congress has broad power to raise and regulate armies and navies, and deserves "healthy deference" in this area, "[n]one of this is to say that Congress is free to disregard the Constitution when it acts in the area of military affairs."  *See Rostker*, 453 U.S. at 66–67.  Thus, the Court rejects this argument.

deference to legislative and executive judgments in the area of military affairs." *Id.* at 66. But "deference does not mean abdication." *Id.* at 70. "None of this is to say that Congress is free to disregard the Constitution when it acts in the area of military affairs. In that area, as any other, Congress remains subject to the limitations of the Due Process Clause." *Id.* at 67.

Against this backdrop, the Supreme Court examined the legislative record, which demonstrated that the purpose of the MSSA was to prepare and maintain a pool of combat troops in the event of a draft. *Id.* at 76. The Court observed that then-existing statutory and policy restrictions prohibited women from serving in combat roles. *Id.* ("Women as a group, however, unlike men as a group, are not eligible for combat.") (citing 10 U.S.C. §§ 6015, 8549). Thus, "[m]en and women, because of the combat restrictions on women, are simply not similarly situated for purposes of a draft or registration for a draft." *Id.* at 78. In light of this fact, the Supreme Court noted that since the purpose of registration was to prepare for the draft of combat troops, the restriction on women was "not only sufficiently but also closely related to" that purpose. *See id.* at 79.

The Court also explained that the district court had erred in relying on testimony that the military could absorb a small group of women to serve in non-combat roles, noting that in doing so the district court had ignored "Congress' considered response to this line of reasoning." *Id.* at 81. Particularly, given that women could only serve in non-combat roles, Congress determined that registering and drafting women would "needlessly" burden training, would impose "added burdens" and "administrative problems such as housing and different treatment with regard to dependency, hardship and physical standards," and would "be positively detrimental to the important goal of military flexibility." *Id.* at 81–82. And in light of the deference owed, the Court noted that it was "not for th[e] Court to dismiss such problems as insignificant in the context of

military preparedness and the exigencies of a future mobilization." *Id.* at 81.  As such, the Court

adopted "an appropriately deferential examination of *Congress'* evaluation of that evidence."  *Id.*

at 83.

As a result, the Court held that the sex-based classification drawn by the MSSA, even

though facially discriminatory, was "not invidious, but rather realistically reflect[ed] the fact that

the sexes [were] not similarly situated."  *Id.* at 79 ("The Constitution requires that Congress treat

similarly situated persons similarly, not that it engage in gestures of superficial equality.") (internal

quotation marks omitted).

2.      <strong>Developments Since <em>Rostker</em></strong>

As Plaintiff alleges, there have been substantial changes since *Rostker* was decided.  (*See*

SAC ¶¶ 43 & 54).  Soon after the *Rostker* decision, groups of women began to serve in combat

zones and in some instances took part in combat operations, including in Operation Urgent Fury,

Operation Just Cause, Operation Desert Storm, and more recently in the Iraq and Afghanistan

wars.  (*See id.* ¶¶ 43a–ww).  On December 5, 1991, Congress repealed the statutory ban on women

from serving on aircraft engaged in combat missions.  National Defense Authorization Act For

Fiscal Years 1992 And 1993, Pub. L. No. 102-190 § 531, 105 Stat 1290, 1365 (1991).  This was

followed by the repeal of the prohibition on assigning women to combat ships on November 30,

1993.  National Defense Authorization Act For Fiscal Year 1994, Pub. L. No. 103-160 § 541, 107

Stat. 1547, 1659 (1993).  And in 1994 the Secretary of Defense issued a report at the request of

President Clinton which "recognized the vastly increased role being played by women in each of

the Armed Services, and concluded that [b]ecause of this change in the makeup of the Armed

Forces, much of the congressional debate which, in the [Supreme] court's [1981] opinion, provided

adequate congressional scrutiny of the issue . . . would be inappropriate today."  (SAC ¶¶ 43n–o

(internal quotation marks omitted) (alterations in original)).

More recently, in 2010 Secretary of Defense Gates gave notice to Congress of the intent to permit the assignment of women to submarines and to expand the role of women in the Marine Corps.  (*Id.* ¶¶ 43y–z).  And in 2011 "the congressional Military Leadership Diversity Commission [ ] issued a final report urging Congress to allow women into male-only land combat units." *Elgin v. U.S. Dep't of Treasury*, 641 F.3d 6, 23 (1st Cir. 2011) (Stahl, J., concurring), *aff'd sub nom. Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) (citing *From Representation to Inclusion: Diversity Leadership for the 21st–Century Military,* Final Report (Military Leadership Diversity Comm'n, Arlington, Va.) Mar. 15, 2011, at 71–74, 127, *available at* http://mldc.whs.mil/index.php/final-report).

On January 24, 2013, the Secretary of Defense and the Chairman of the Joint Chiefs of Staff issued a directive rescinding the military's 1994 Direct Ground Combat Exclusion Rule, which had until then restricted the ability of women to serve in certain combat positions.  (*See* SAC ¶¶ 45–48).[11]  This was followed by a flurry of changes as the different military branches undertook steps to integrate women at almost every position.  (*See* SAC ¶¶ 54a–54xx).  Then, on December 3, 2015, the Secretary of Defense announced that "no exceptions are warranted to the full implementation of the rescission of the '1994 Direct Combat Definition and Assignment Rule'" and that "[a]nyone, who can meet operationally relevant and gender neutral standards, regardless of gender, should have the opportunity to serve in any position."[12]

---

[11]     *See also* Memorandum from Secretary of Defense Leon Panetta and Chairman of Joint Chiefs of Staff Martin Dempsey for Secretaries of the Military Departments on Elimination of the 1994 Direct Ground Combat Definition and Assignment Rule (January 24, 2013), https://dod.defense.gov/Portals/1/Documents/WISRJointMemo.pdf.

[12]     *See* Memorandum from Secretary of Defense Ash Carter for Secretaries of the Military Departments on Implementation Guidance for the Full Integration of Women in the Armed Forces (December 3, 2015), https://dod.defense.gov/Portals/1/Documents/pubs/OSD014303-15.pdf.

Following the Secretary of Defense's decision, the House of Representatives and the Senate debated a provision in the FY17 NDAA that would have required women who attain the age of 18 years on or after January 1, 2018, to register with the SSS.  (*See* D.E. No. 57); H.R. 4909, 114th Cong. (2016); S. 2943, 114th Cong. (2016).  This provision was later removed, and on November 29, 2016, Congress passed the 2017 NDAA which created the Commission.  *See* FY17 NDAA, §§ 551–557.

### 3.    Analysis

Against this backdrop, the Court turns to the instant case and finds that Defendants' argument that *Rostker* bars Plaintiff's claim fails for two main reasons.

First, the *Rodriguez* doctrine does not have an application in this case.  *Rodriguez* instructs that lower courts should not assume that a newer Supreme Court decision implicitly overrules a prior precedent.  *See Rodriguez*, 490 U.S. at 484.  In *Rodriguez*, for example, the Supreme Court revisited the thirty-six-year-old precedent *Wilko v. Swan*, 346 U.S. 427 (1953).  *Id.* at 479.  *Wilko* had held that claims under the Securities Exchange Act could not be arbitrated.  *Id.*  In a string of decisions in the 1980's, however, the Supreme Court appeared to abandon the *Wilko*'s underlying reasoning without explicitly overruling *Wilko* itself.  *See id.* at 480–81 (collecting cases).  The *Rodriguez* Court finally overruled *Wilko*, but in doing so noted:

> We do not suggest that the Court of Appeals on its own authority should have taken the step of renouncing *Wilko.* If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in *some other line of decisions*, the [lower court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.

*Id.* at 484 (emphasis added).

The Supreme Court has continually re-asserted this rule, which instructs that when a Supreme Court decision directly controls, the lower court should follow that decision even if its

reasoning appears to have been rejected by *later decisions* of the Court. *See, e.g.*, *United States v. Hatter*, 532 U.S. 557, 567 (2001) (overruling an earlier decision but noting with approval that the Court of Appeals had not done so because, while doubt had been casted on that earlier decision by *subsequent decisions*, the Supreme Court had not expressly overruled it); *Hohn v. United States,* 524 U.S. 236, 252–53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether *subsequent cases* have raised doubts about their continued vitality.") (emphasis added); *State Oil Co. v. Khan*, 522 U.S. 3, 20–21 (1997) (overruling directly controlling decision but noting that the "Court of Appeals was correct in applying that principle despite disagreement with" that prior decision, which had been "eroded" by *intervening decisions* of the Supreme Court); *Agostini*, 521 U.S. at 207 ("The Court neither acknowledges nor holds that other courts should ever conclude that its *more recent cases* have, by implication, overruled an earlier precedent.") (emphasis added).

Here, however, Plaintiff has not asked this Court to consider whether a newer Supreme Court decision has implicitly overruled *Rostker*.  Rather, Plaintiff asks the Court to consider the effect that intervening actions undertaken by the Pentagon and Congress has had on the current enforcement of the MSSA.  (*See, e.g.,* SAC ¶¶ 16–19, 42–43 & 54; Pl.'s Opp. Br. at 30).  Neither *Rodriguez* nor its progeny say anything about such a situation.  *See Rodriguez*, 490 U.S. at 484.

Defendants point the Court to the concurrence in *Elgin* to support their argument that the *Rodriguez* doctrine applies to intervening factual changes.  (Defs.' Mov. Br. at 19 (citing *Elgin*, 641 F.3d at 24 (Stahl, J., concurring)).  But *Elgin* is easily distinguishable for two reasons.  First, unlike this case, the plaintiffs there argued that an intervening Supreme Court decision had implicitly overturned *Rostker*; i.e., precisely what *Rodriguez* says lower courts cannot do.  *See Elgin*, 641 F.3d at 22.  And second, unlike the allegations in this case, at the time *Elgin* was decided

"women [were] still precluded from ground combat positions." *Id.* at 23.  In short, because Plaintiff contends that intervening factual changes have altered the application of the MSSA, and not that an intervening Supreme Court decision has eroded *Rostker's* legal foundation, the rule outlined by *Rodriguez* and its progeny simply does not apply in this case.

Second, even if this Court were to apply the *Rodriguez* doctrine, at this stage of the litigation it cannot be said that the holding in *Rostker* directly controls the question before this Court, and therefore, it cannot be said that *Rostker* bars Plaintiff's equal protection claim.  Under *Rodriguez*, a lower court "should follow the case *which directly controls*. . . ."  490 U.S. at 484 (emphasis added).  A precedent is controlling if it "compel[s] the outcome" in the later case; that is, if the earlier case "answer[ed] the definitive question" posed by the later one.  *See Lambrix v. Singletary*, 520 U.S. 518, 528 n.3 (1997); *United States v. Bruno*, 487 F.3d 304, 306 (5th Cir. 2007) (stating that two prior Supreme Court cases "are not direct precedents" because "[i]n neither did the Court analyze the precise question [a later case] squarely addressed").

As explained above, *Rostker* rested on the fact that at the time "[w]omen as a group, [ ] unlike men as a group, are not eligible for combat" and therefore they were "simply *not similarly situated* for purposes of a draft or registration for a draft."  *Rostker*, 453 U.S. at 76, 78 (emphasis added).  Having found that men and women were differently situated, the *Rostker* Court proceeded to explain how the classification was justified in light of the purpose of the MSSA.  *Id.* at 76–79. Particularly, since the purpose of registration is to prepare for the draft of combat troops, and at the time women were excluded from combat, the Supreme Court determined that the classification was "not only sufficiently but also closely related to" that purpose.  *See id.* at 79.  Accordingly, the Supreme Court found that, at the time, the classification drawn by the MSSA was constitutional because the "Constitution requires that Congress treat similarly situated persons similarly, not that

- 28 -

it engage in gestures of superficial equality." *Id.*

Defendants ask that this Court apply *Rostker's* holding to the present alleged facts and summarily dismiss Plaintiff's current claim. But "[t]here is . . . a difference between following a precedent and extending a precedent." *Jefferson Cty. v. Acker*, 210 F.3d 1317, 1320 (11th Cir. 2000). When the facts of a Supreme Court decision "do not line up closely with the facts before [the Court]," it cannot be said that the decision "directly controls" the new case. *See id.* Here, Plaintiff alleges that as a result of Pentagon and Congressional actions women can serve in all combat roles, and therefore, men and women are now similarly situated for purposes of the MSSA. (SAC ¶¶ 43, 45 & 56; Pl.'s Opp. Br. at 9). Plaintiff, thus, asks this Court to answer the following question: whether the sex-based classification drawn by the MSSA is substantially related to achieving the purposes of the MSSA, when men and women *are* similarly situated. Consequently, Plaintiff poses a question never addressed by the *Rostker* Court, and as a result, *Rostker* cannot "compel the outcome" of this case. *See Lambrix*, 520 U.S. at 528 n.3. Accordingly, while persuasive and instructive, *Rostker* does not "directly control[ ]" this case. *See Acker*, 210 F.3d at 1320; *Bruno*, 487 F.3d at 306; *United States v. Acosta*, 502 F.3d 54, 60 (2d Cir. 2007) (stating that, where "neither [of two Supreme Court cases], stands as direct precedent requiring" an outcome, "*no* Supreme Court precedent stands in the way of [the lower court's] holding").

Defendants also contend that the "holding in *Rostker* was justified not only by the exclusion of women from combat roles, but also by the significant administrative burdens that would likely stem from registering and drafting women." (Defs.' Reply at 9 (citing *Rostker*, 453 U.S. at 81)). They contend that these administrative concerns are still applicable today, and therefore, *Rostker* controls the outcome of this case. (*Id.* at 9–10). As described by *Rostker*, however, the administrative concerns supporting Congress's decision to exclude women stemmed from the fact

that women could not serve in combat roles.  *See Rostker*, 453 U.S. at 81 ("[A]ssuming that a small number of women could be drafted for noncombat roles, Congress simply did not consider it worth the added burdens of including women in draft and registration plans.").  And although *Rostker* instructed that courts should give great deference to Congress's evaluation of such administrative concerns, the Supreme Court did not state that administrative convenience alone was sufficient to justify the sex-based classification created by the MSSA.  *See id.*  To the contrary, the Supreme Court stated that "deference does not mean abdication."  *See id.* at 70.  Thus, for purposes of this motion, Plaintiff is entitled to the reasonable inference that the administrative concerns described by the *Rostker* Court are not as tangible as they once were, given that today women are already serving in combat roles.  *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011) (noting that in a motion to dismiss the "plaintiff must be given the benefit of every favorable inference").

It is true that based on the facts as they existed in 1981 the *Rostker* Court held that the MSSA was constitutional.  It is also true that in the event this Court ultimately grants judgment in favor of Plaintiff it would mean a finding that the MSSA is unconstitutional as presently applied.  But that does not necessarily mean that *Rostker* will be overturned.  And regardless, where a law has been previously sustained the "decision sustaining the law cannot be regarded as precluding a subsequent suit for the purpose of testing [its] validity . . . in the lights of the later actual experience."  *Abie State Bank v. Weaver*, 282 U.S. 765, 772 (1931).  Indeed, "[a] statute valid as to one set of facts may be invalid as to another.  A statute valid when enacted may become invalid by change in the conditions to which it is applied."  *Nashville, C. & St. L. RY. v. Walters*, 294 U.S. 405, 415 (1935) (footnote omitted); *United States v. Carolene Products Co.*, 304 U.S. 144, 153 (1938) ("[T]he constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist."); *see also*

*Third Nat. Bank of Louisville v. Stone*, 174 U.S. 432, 434 (1899) ("A question cannot be held to have been adjudged before an issue on the subject could possibly have arisen.").  Therefore, in light of the alleged substantial factual changes since *Rostker* was decided, this Court cannot at this stage of the litigation find that *Rostker* controls the outcome of Plaintiff's claim.

In short, Plaintiff asserts that as currently applied the MSSA violates her constitutional right to equal protection.  (*See* SAC ¶¶ 19 & 67).  She alleges that she received different treatment on account of her sex, that men and women are similarly situated for purposes of the MSSA because they can both serve in combat roles, and that Defendants cannot show that the classification drawn is substantially related to achieving the MSSA's objectives.  (*See id.* ¶¶ 5, 18, 35, 42, 45, 49, 54–56 & 61–64).  Because *Rostker* explicitly requires the government to comply with the Constitution in the area of military affairs, and because Plaintiff alleges Defendants did not, Plaintiff states an equal protection claim upon which relief can be granted.  *See Rostker*, 453 U.S. at 67; *Twombly*, 550 U.S. at 570; *see also Nat'l Coal. for Men v. Selective Serv. Sys.*, No. 16-3362, 2018 WL 1694906, at *4 (S.D. Tex. Apr. 6, 2018).  Accordingly, Defendants motion to dismiss must be denied.

## IV.     Conclusion

For these reasons, the Court GRANTS-IN-PART and DENIES-IN-PART Defendants' motion.  Plaintiff's substantive due process claim is dismissed *with prejudice*.  Defendants' motion is denied in all other respects.  An appropriate Order accompanies this Opinion.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**